OPINION *Page 2 
{¶ 1} On March 26, 2007, appellee, Bond and Associates Title Agency, filed an interpleader action to resolve a dispute among creditors as to who was entitled to escrowed funds in the amount of $150,287.29. The funds were proceeds from the sale of a restaurant owned by BW Downs, Inc.
 {¶ 2} A hearing before a magistrate was held on January 23, 2008. By decision filed February 7, 2008, the magistrate recommended the following distribution: 1) $995.71 to the Ohio Department of Taxation; 2) $118,494.89 to Avalon Foodservice, Inc.; 3) $17,392.00 to Nagel Advertising, Inc.; 4) $8,500.00 to Canton Five, Inc. for attorney fees; and 5) the remaining $4,904.69 to BW Downs as proceeds from the sale. Appellant, JP Morgan Chase Bank, NA, successor by merger to Bank One, NA, was entitled to the $4,904.69 as a result of a prior attachment proceeding.
 {¶ 3} Appellant filed objections. By judgment entry filed February 26, 2008, the trial court denied the objections and approved and adopted the magistrate's decision.
 {¶ 4} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 I {¶ 5} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT CHASE WAS NOT A SECURED CREDITOR OF BW DOWNS AND AS SUCH WAS NOT ENTITLED TO PAYMENT IN FULL PRIOR TO ANY OTHER CREDITORS."
 II {¶ 6} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT CHASE WAS NOT EQUIVALENT WITH OTHER UNSECURED CREDITORS *Page 3 
AND DID NOT ORDER THE INTERPLEADER FUNDS TO BE DISTRIBUTED ON A PRO-RATA BASIS WITH NAGEL AND AVALON BASED UPON THE AMOUNTS DUE."
 III {¶ 7} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT CHASE'S GARNISHMENT ORDER HAD NO EFFECT ON PRIORITY AND THAT CHASE WAS NOT ENTITLED TO THE ENTIRE AMOUNT OF THE INTERPLEADER FUNDS PURSUANT TO ITS GARNISHMENT ORDER."
 IV {¶ 8} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT NAGEL WAS ENTITLED TO PAYMENT FROM THE INTERPLEADER FUNDS EVEN THOUGH THE PARTIES DID NOT INTEND, NOR DID THE PURCHASE CONTRACT PROVIDE, THAT NAGEL WOULD BE PAID FROM THE ESCROW ACCOUNT."
 V {¶ 9} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT CANTON FIVE WAS ENTITLED TO A `SET OFF' FOR PAYMENT OF ITS ATTORNEYS' FEES AFTER CHASE HAD ALREADY OBTAINED A LIEN ON ANY FUNDS DUE BW DOWNS WITH THE GARNISHMENT ORDER FILED ON MARCH 16, 2007." *Page 4 
 VI {¶ 10} "THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION FOR SUMMARY JUDGMENT AS THERE WERE NO ISSUES OF MATERIAL FACT."
 I {¶ 11} Appellant claims the trial court erred in determining it was not a secured creditor of BW Downs. We disagree.
 {¶ 12} We find the gravemen of this assignment is appellant's status as a creditor vis-à-vis the October 5, 2006 Asset Purchase Agreement between Canton Five and BW Downs. Canton Five was the buyer and BW Downs was the seller of assets used in the Buffalo Wild Wings Grill Bar restaurant located at 4440 Belden Village Street, Canton, Ohio.
 {¶ 13} In adopting the magistrate's February 7, 2008 decision, the trial court specifically found appellant relinquished its security interest in the Asset Purchase Agreement per R.C. 1309.513(C)(1) which governs termination statements. See, Conclusion of Law Nos. 10-16. The trial court further found appellant was estopped from retaining a security interest in the remaining assets because of "its actions in filing the termination statement." See, Conclusion of Law No. 16. We concur with the trial court's decision for the following reasons.
 {¶ 14} It is conceded by all parties that the facts are not in dispute. See, Stipulations of Fact filed January 23, 2008. We hereby adopt the magistrate's findings as adopted by the trial court in its judgment entry filed February 26, 2008. Of particular importance to our reasoning are Finding of Fact Nos. 31-35 which state the following: *Page 5 {¶ 15} "31. In exchange for payment of the $232,328 Note and the $536,000 Note, Chase agreed to relinquish its liens and security interests. (Def. Exs. 1 and 4).
 {¶ 16} "32. On or about January 29, 2007, Chase received payment in full for the $536,000 Note. (Stipulation (¶ 15). On that date, Chase also received payment in full for the $232,328 Note. (Stipulation ¶ 16).
 {¶ 17} "33. On or about February 5, 2007, Chase filed a UCC Termination (`UCC Termination') concerning the previously filed Financing Statement, which stated that' [e]ffectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.' (Jt. Ex. I; Stipulation ¶ 18).
 {¶ 18} "34. The settlement statement also noted that BW would supply $102,977.93 at closing, which was listed on line item 603 on the settlement statement as `Cash From Seller.' (Jt. Ex. H).
 {¶ 19} "35. This was the exact amount owed on the $173,300 Note. (Id. at line item 1327)."
 {¶ 20} In the Asset Purchase Agreement between Canton Five and BW Downs, the Settlement Statement provided for the assets to be transferred free and clear of any encumbrances:
 {¶ 21} "1. PURCHASE AND SALE. Subject to the terms and conditions of this Agreement and all Schedules and Exhibits referenced herein and attached hereto, Buyer agrees to purchase from Seller and Seller agrees to sell, assign, transfer, convey and set over to Buyer free and clear of any and all liabilities, security interests, obligations, liens and encumbrances whatsoever on the date of the Closing (as *Page 6 
hereinafter defined) all of Seller's right, title, and interest in and to the Permit and the personal property set forth below (collectively the `Assets'):* * *.
 {¶ 22} "* * *
 {¶ 23} "3. PAYMENT. The Purchase Price payable by Buyer to Seller for the Permit, the Business, the Franchise Agreement, and the Assets shall be payable at the Closing subject to the following terms and conditions:
 {¶ 24} "(A) * * * No monies held in the Escrow Account shall be released or paid to Seller until all debts and liabilities arising out of the operation of the Business prior to the Possession Date have been paid in full, at which time the remaining balance in the Escrow Account, if any, including interest earned, shall be released to the Seller. The monies in the Escrow Account shall be applied and disbursed as follows: (i) first to pay any liabilities and debts for which Buyer could be held liable as a successor in interest to the Business, the Assets, or Permit pursuant to any local, state or federal statute or common law or applicable rules, regulations or decisions of any governmental or taxing authority or body, including, without limitation, sales taxes and unemployment contributions; (ii) second to pay the loan from Bank One (and subsequently assigned to Chase Bank) to Seller taken in connection with the Business and/or the Assets and having a current outstanding principal balance of approximately One Hundred Ten Thousand Dollars ($110,000.00) (the `Bank One Loan') and any other loans or debts which are secured by a lien or security interest against any of the Assets or the nonpayment of which might adversely affect Buyer's title, ownership or use of any or all of the Assets; (iii) third to pay the tax liabilities of Seller, including, without limitation, income, payroll, employment, withholding, social security, unemployment, real property, *Page 7 
personal property, franchise, sales, use, transfer, or other tax of any kind or nature whatsoever, including any interest, penalties, or addition thereto, whether disputed or not; and (iv) last to pay the remaining debts and liabilities arising out of the operation of the Business prior to the Possession date.* * *"
 {¶ 25} An email dated January 25, 2007 from "martinechols" from appellant to "ashlandbdubs" stated, "The Bank will agree to release our liens for BW Downs provided we receive the payoffs indicated on line item 1322 1323. You can overnight those payoffs to the address listed below." See Defendant's Exhibit 4.
 {¶ 26} As delineated in the January 23, 2008 stipulations, appellant filed a UCC Termination on February 5, 2007:
 {¶ 27} "18. On or about February 5, 2007, Chase filed a UCC Termination (`UCC Termination') with regard to the previously filed Financing Statement. A true and accurate copy of the UCC Termination is attached hereto as Exhibit I. The Financing Statement was filed on December 17, 1998, as Financing Statement Number AP0108395. True and accurate copies of the Financing Statement and Continuation Statement are attached hereto as Exhibit J."
 {¶ 28} A Settlement Statement was prepared in connection with the Asset Purchase Contract. The Settlement Statement, Exhibit H, listed all three of the obligations due appellant:
 {¶ 29} "1322. Chase Bank Belden note #00450133449001 to Chase Bank $95,229.66 [regarding $232,328.00 note]
 {¶ 30} "1323. Chase Bank Alliance Note #00450133449002 to Chase Bank $10,970.20 [regarding $536,000.00 note] *Page 8 
 {¶ 31} "1327. Chase Bank #00450133449003 to Chase Bank $102,977.93 [regarding $173,300.00 note]"
 {¶ 32} Appellant was paid in full for the first two notes (Stipulation Nos. 15 16), but was not paid in full on the $173,300 note (Stipulation No. 17). The money due under the $173,300 note was incurred from a separate Buffalo Wild Wings Grill Bar restaurant located in Alliance, Ohio. T. at 54. As a result of the outstanding note, in March of 2007, appellant filed a request and notice of non-wage garnishment to garnish funds in the escrow account held by appellee.
 {¶ 33} The central issue to be resolved is whether the language of appellant's UCC Termination invalidated appellant's March 2007 garnishment.
 {¶ 34} The express language of the UCC Termination, the specific e-mail cited supra, and the Settlement Statement establishes appellant was not entitled to any of the proceeds under the Asset Purchase Agreement. At issue was the $150,287.29 of escrowed funds available to the creditors of BW Downs. As a judgment creditor, appellant asserted its claims to these funds, although its claims were not claims against the specific assets being sold under the Asset Purchase Agreement. As stated supra, the agreement provided for the distribution of funds to satisfy the creditors of the specific assets involving the Canton restaurant. It must also be noted that the Settlement Statement Entry No. 1327 was to be paid by BW Downs at closing. BW Downs did not pay appellant the amount at closing. T. at 75-76.
 {¶ 35} The clear intent of appellant's actions which it is now bound to honor was to release its liens as to the specific asset sale transactions. The fact that BW Downs failed to fulfill the agreement to come to the closing with private funds for appellant did *Page 9 
not negate the true intent of the UCC Termination and appellant's subsequent agreement.
 {¶ 36} If in fact money was in theory available for the total distribution free and clear of the creditors to the premises, the money would be properly subject to attachment by appellant. However, the escrowed funds were insufficient to cover the remaining creditors.
 {¶ 37} R.C. 1308.315(A) and (C)(1) support the fact that appellant's actions relinquished the escrowed funds from attachment:
 {¶ 38} "(A) Except as otherwise provided in this chapter and in division (B) of section 1302.44 of the Revised Code:
 {¶ 39} "(1) A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
 {¶ 40} "(2) A security interest attaches to any identifiable proceeds of collateral.
 {¶ 41} "(C) In cases not governed by division (A) of this section, within twenty days after a secured party receives an authenticated demand from a debtor, the secured party shall cause the secured party of record for a financing statement to send to the debtor a termination statement for the financing statement or file the termination statement in the filing office if:
 {¶ 42} "(1) Except in the case of a financing statement covering accounts or chattel paper that has been sold or goods that are the subject of a consignment, there is *Page 10 
no obligation secured by the collateral covered by the financing statement and no commitment to make an advance, incur an obligation, or otherwise give value."
 {¶ 43} Upon review, we find the trial court did not err in determining that appellant's order of garnishment was not to be honored.
 {¶ 44} Assignment of Error I is denied.
 II, III, IV {¶ 45} Appellant claims the trial court erred in finding it did not have a priority attachment on the escrowed funds or that it was not entitled to a pro-rata distribution with Nagel and Avalon. Appellant also claims Nagel was not a creditor contemplated to be paid under the Asset Purchase Agreement. We disagree.
 {¶ 46} First, appellees argue these matters were not objected to. We disagree. We find these issues were subsequent and collateral to the main objections and therefore were properly raised.
 {¶ 47} The Asset Purchase Agreement provided for the distribution of the funds. In particular, the agreement provided for the payment of any remaining debt and liabilities arising out of the operation of the business prior to possession.
 {¶ 48} We find our discussion in Assignment of Error I is controlling on appellant's claimed priority.
 {¶ 49} Appellant also argues it was entitled to a pro-rata distribution. We disagree. The clear meaning of the Asset Purchase Agreement and appellant's actions belie such a conclusion. *Page 11 
 {¶ 50} Lastly, appellant argues Nagel was not a contemplated creditor to receive funds from the escrow account. Stipulation No. 13 established the Nagel debt arose out of the operation of the business:
 {¶ 51} "The obligation due to Nagel from BW Downs was not listed on the Settlement Statement (the `Nagel Obligation'). The Nagel Obligation arises from advertising services provided to BW Downs for the period of February 1, 2003 through September 29, 2006."
 {¶ 52} We find appellant's challenges to Nagle and the trial court's order of distribution to be unfounded.
 {¶ 53} Assignments of Error II, III and IV are denied.
 V {¶ 54} Appellant claims the trial court erred in finding that Canton Five was entitled to attorney fees. We disagree.
 {¶ 55} Section 15(A) of the Asset Purchase Agreement states the following in pertinent part:
 {¶ 56} "Seller and Paul Swain, Floyd Heuser, and Mary Ellen Swain, jointly and severally, agree to and shall defend, indemnify and hold Buyer harmless, subject to the right of offset pursuant to Section 15(B) hereof, from and against any and all claims, demands, causes of action, losses, liabilities, damages, and expenses, including reasonable attorney fees, pertaining to or arising out of: (i) the operation of the Business or any business transacted under the authority of the Permit prior to the Possession Date, including, without limitation, all obligations relating to any claims made by a creditor of Seller, Seller's agents or employees; (ii) Seller's ownership of the Assets or *Page 12 
any assets of Seller or the Business not being transferred to Buyer on or before Closing; (iii) the Seller using or occupying the Premises; (iv) any misrepresentation by Seller in connection with this sale; or (v) Seller's breach of any warranty, covenant, term or condition contained in this Agreement, or any act or omission by Seller which constitutes a breach of this Agreement."
 {¶ 57} In the magistrate's decision adopted by the trial court, the trial court concluded the following:
 {¶ 58} "As Section 15(B) of the Asset Purchase Agreement provides that Canton Five shall receive a set off against any amounts due BW under the agreement equal to any liability incurred by Canton Five as a result of BW's failure to perform, Canton Five is entitled to a set off of $8,500.00 for its reasonable attorney fees incurred as the result of BW's lapses after the above obligations have been satisfied."
 {¶ 59} Upon review, we find no error in the trial court's decision.
 {¶ 60} Assignment of Error V is denied.
 VI {¶ 61} Appellant claims the trial court erred in denying its motion for summary judgment as there were no issues of material fact. We disagree.
 {¶ 62} Appellant argues regardless of the UCC Termination, it was a secured creditor entitled to a garnishment order. We note at the time of the trial court's decision, there were also summary judgment motions filed on behalf of Canton Five and Nagel. All of these motions were filed prior to the agreed Stipulations of Fact. Also pending were motions for default judgment. *Page 13 
 {¶ 63} The trial court denied all of the motions for summary judgment. Although the matters argued were legal issues, there were still factual evidence to be presented i.e., the testimony of Andrew Schroer, Kenneth Brown, David King, and Michael McLean, as well as exhibits apart from the stipulations, including the Settlement Statement.
 {¶ 64} Upon review, given the state of the record, we find the trial court did not err in denying the motion.
 {¶ 65} Assignment of Error VI is denied.
 {¶ 66} The judgment of the Court of Common Pleas of Stark County, Ohio is hereby affirmed.
 Farmer, J., Hoffman, P.J. and Edwards, J. concur. *Page 14 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio is affirmed. *Page 1