[Cite as *State v. Hickman*, 2023-Ohio-1793.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

       Plaintiff-Appellee,

- vs -

DELMAR LEE HICKMAN,

       Defendant-Appellant.

CASE NO. 2022-A-0114

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 0000 PC 10914

**O P I N I O N**

Decided: May 30, 2023
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Christopher R. Fortunato*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Margaret Brunarski*, Ashtabula County Public Defender, and *Michael J. Ledenko*, Assistant Public Defender, 22 East Jefferson Street, Jefferson, OH 44047 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1}    Appellant, Delmar Lee Hickman, appeals the judgment of the Ashtabula County Court of Common Pleas, denying the recommendation of his psychologist as well as an independent expert that he be granted conditional release from a hospital into a less-restricted group home. We affirm.

{¶2}    On August 14, 1980, at the age of 17, appellant shot his parents multiple times with a rifle, killing them both. Appellant was tried in 1984 on two counts of aggravated murder and found not guilty by reason of insanity. Appellant has been

continuously incarcerated and/or hospitalized since his arrest on the date of the homicides.

{¶3} Prior to being acquitted, in 1983, appellant's psychiatrist, Dr. Richard Fishell, diagnosed appellant with intermittent explosive disorder, based upon his history; borderline intellectual functioning; schizoid personality; and seizure disorder.

{¶4} In 1985, Dr. J. William McIntosh, a psychologist with the Dayton Mental Health Center, the facility to which appellant was transferred after the acquittal, performed a status report on appellant. Dr. McIntosh ultimately concluded that appellant had adjusted well to the facility and did not suffer from a mental disorder "such as those which are usually termed psychosis." The doctor noted that appellant's past shows problems with impulse control stemming from poor conscience and moral development. Still, Dr. McIntosh recommended appellant be transferred to a less-restrictive treatment setting.

{¶5} Appellant was so transferred and for nearly the past 37 years he has been hospitalized at Heartland Behavioral Healthcare. According to his treating psychologist, Dr. Zev Goldberg, appellant possesses borderline intellectual functioning (I.Q. tests range from 73 to 76). Dr. Goldberg also diagnosed appellant with "Unspecified Trauma- and Stressor-Related Disorder, By History." Pursuant to his report, the doctor stated this diagnosis is utilized when symptoms characteristic of a trauma- and stressor-related disorder appear to have been present, but there is insufficient information to make a more specific diagnosis. The diagnosis related back primarily to physical and verbal abuse appellant experienced while he was growing up. And Dr. Goldberg clarified that the 1983 diagnosis of intermittent explosive disorder and any diagnosis of antisocial personality disorder has been "rejected by numerous psychiatrists who have worked with [appellant]."

2

{¶6} Dr. Goldberg also emphasized appellant does not show a history of problems with a personality disorder, let alone an antisocial personality disorder. Further, the doctor observed that over the course of his hospitalization, appellant has rarely demonstrated irritability and "very rarely" exhibited aggressiveness. Dr. Goldberg did testify, however, that appellant has had problems with other peers. He asserted that the problems were initiated by others and the last episode occurred in 2012.

{¶7} Appellant, historically, has been unmedicated. In 2017, however, he was started on the drug Abililfy, a medicine to control impulsivity. Dr. Goldberg testified that the medication was started as a "prophylactic treatment" as appellant is directed toward leaving the hospital setting and moving into the general community. Although appellant has remained on the medication, the doctor testified "there is really no clear indication that the medication is necessary."

{¶8} Dr. Goldberg additionally noted that appellant worked full-time at a local Goodwill store from 1987 to 2012. The doctor testified appellant was considered a responsible worker and got along well with co-workers. Apparently, appellant lost his job when the Goodwill changed ownership. Dr. Goldberg stated appellant did not lose his job because he did anything wrong. During his employment, appellant either walked to work or took public transportation. He always returned to the hospital after work.

{¶9} Dr. Goldberg noted a minor incident which occurred during appellant's employment. He had a disagreement with a peer at work, but the incident did not warrant any formal discipline. Still, appellant commenced an anger management program with Heartland, which he completed.

3

{¶10} A second expert was enlisted to examine appellant and issue a report. Dr. Jessica Hart, a psychologist with the Forensic Psychiatric Center of Northeast Ohio, had similar clinical impressions to Dr. Goldberg. Dr. Hart noted appellant had borderline intellectual functioning and unspecified trauma- and stressor-related disorder, by history. Dr. Hart noted that, during her evaluation, appellant "does not appear to have any significant mood, anxiety, or psychotic symptoms that are affecting [appellant's] daily life." Although appellant has a history of violence (based upon the underlying offenses), the doctor observed there is no indication of any history of relationship instability, personality disorder, violent attitudes, or noncompliance with treatment.

{¶11} After completing their evaluations, both Dr. Goldberg and Dr. Hart recommended appellant be given conditional release into a group-home setting.

{¶12} Notwithstanding the foregoing, the trial court denied and disapproved the recommendation that appellant be given conditional release to the group home. The trial court observed:

> It was determined by clear and convincing evidence that the Acquittee, Delmar Hickman, remains a mentally ill person subject to court order pursuant to O.R.C. 2945.401. The Court finds that Mr. Hickman would benefit from continued treatment in a hospital setting to address his Borderline Intellectual Functioning, Intermittent Explosive Disorder, and Schizoid Personality Disorder as described in the reports. The Court further finds that Mr. Hickman is a potential threat to public safety and other people if he were to be released in an uncontrolled and unmonitored environment other than a hospital setting. The least restrictive commitment alternative available consistent with the welfare of the Acquittee and public safety remains commitment to Heartland Behavioral Healthcare at his current Level 5 movement.

4

Case No. 2022-A-0114

{¶13} Appellant now appeals the trial court's judgment and assigns the following as error:

{¶14} "The trial court erred by abusing its discretion to deny Mr. Hickman unsecured conditional release because the State of Ohio did not support its objection to unsecured conditional release by clear and convincing evidence."

{¶15} The procedure at issue is governed by R.C. 2945.401. That statute sets forth a comprehensive scheme which provides a trial court with continuing jurisdiction over the commitment conditions of persons committed to mental-health institutions by order of the court. *State v. Stutler*, 169 Ohio St.3d 639, 2022-Ohio-2792, --- N.E.3d ----, ¶ 10. R.C. 2945.401(E) sets forth various factors that a trial court must consider when ruling on a recommendation that a committed individual be granted "nonsecured status" or having his or her commitment terminated. R.C. 2945.401(E) states the trial court must consider:

> (1) Whether, in the trial court's view, the defendant or person currently represents a substantial risk of physical harm to the defendant or person or others;
>
> (2) Psychiatric and medical testimony as to the current mental and physical condition of the defendant or person;
>
> (3) Whether the defendant or person has insight into the defendant's or person's condition so that the defendant or person will continue treatment as prescribed or seek professional assistance as needed;
>
> (4) The grounds upon which the state relies for the proposed commitment;

5

(5) Any past history that is relevant to establish the defendant's or person's degree of conformity to the laws, rules, regulations, and values of society;

(6) If there is evidence that the defendant's or person's mental illness is in a state of remission, the medically suggested cause and degree of the remission and the probability that the defendant or person will continue treatment to maintain the remissive state of the defendant's or person's illness should the defendant's or person's commitment conditions be altered.

{¶16} Pursuant to R.C. 2945.401(H), the prosecutor represents the state as well as the public interest at the hearing on an institution's recommendation for a change of commitment conditions. And, under R.C. 2945.401(G)(2), the prosecutor must show, by clear and convincing evidence, that the proposed change in the condition of commitment to a less restrictive status represents a threat to public safety or a threat to the safety of any person. After a hearing and considering all the above points, "the trial court may approve, disapprove, or modify the recommendation and shall enter an order accordingly." R.C. 2945.401(I).

{¶17} In *Stutler*, 2022-Ohio-2792 at ¶ 15, the Supreme Court of Ohio recently made the following observation regarding the trial court's discretion in a change-of-condition-of-commitment case:

> That a trial court has more discretion to disapprove or modify an institution's recommendation for a committed person's nonsecured movement or termination of the person's commitment explains why the legislature chose to use the word "may" in R.C. 2945.401(I). R.C. 2945.401(I)'s statement that the trial court "may approve, disapprove, or modify" a recommendation made under R.C. 2945.401(D)(1) shows that the court has more discretion to disapprove or modify a recommendation for nonsecured status or

6

termination of commitment based on its findings under R.C. 2945.401(E) than it does for other recommendations for changes that involve the person's remaining supervised. In this context, the use of the word "may" is nothing more than a reflection of the trial court's options, which are based on the type of recommended change in commitment status or conditions before the court. *See United States v. Rogers*, 461 U.S. 677, 706, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion. This common-sense principle of statutory construction is by no means invariable, however, * * * and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute" [footnote omitted]). When the recommended change in a person's commitment status or conditions does not include a request for nonsecured status or termination of the person's commitment, however, the prosecution's burden of proof under R.C. 2945.401(G)(2) remains in full force and effect.

{¶18} In *Stutler*, the institution recommended a change in the individual's commitment level to one of "off-grounds supervised movement." *Id.* at ¶ 14. However, here, it would appear, given appellant was seeking conditional-release, the institution recommended a change of condition to one of "nonsecured status." *See* R.C. 2945.401 (D)(1). "Nonsecured status" is defined, in relevant part, as "any unsupervised, off-grounds movement * * * or any conditional release, that is granted to a person * * * who is found not guilty by reason of insanity * * *." R.C. 2945.37(A)(3). Hence, the trial court in this matter, according to the Court in *Stutler*, enjoyed broader discretion in reaching its conclusion than if the movant sought a change in commitment level, such as one involving "off-grounds supervised movement."

{¶19} With the above standard(s) in mind, the trial court stated it considered the relevant R.C. 2945.401(E) factors. And it emphasized it possessed discretion to either

7

approve, disapprove, or modify the recommendation at issue. In its judgment entry, the court erroneously found appellant needed to continue treatment for intermittent explosive disorder and schizoid personality disorder. At the hearing, Dr. Goldberg expressly stated that other psychiatrists who had worked with appellant since the original 1983 diagnosis had determined appellant did not suffer (any longer) from intermittent explosive disorder or other antisocial personality disorders. And none of the clinical impressions or diagnoses presented in the reports indicate appellant suffers from schizoid personality disorder at this time.

{¶20} Still the trial court's focus upon appellant's borderline intellectual functioning and the severity of his history of violence are uncontroverted. And even though there was testimony and evidence that appellant would be, at some basic level, monitored in the group home, that monitoring would be less rigorous than that of a hospital setting. In this respect, and in light of appellant's history, we cannot conclude the trial court was unreasonable in concluding appellant "is a potential threat to public safety and other people if he were to be released in an uncontrolled and unmonitored environment other than a hospital setting."

{¶21} "The term 'abuse of discretion' * * * is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record." *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-209, ¶ 30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678, 148 N.E. 362 (1925). Put differently, a trial court abuses its discretion when it fails "'to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler,* 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting Black's Law Dictionary 11 (8th Ed.Rev.2004). When a reviewing court is analyzing an

8

issue of law, "the mere fact that the reviewing court would decide the issue differently is enough to find error[.] * * * By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error." *Beechler* at ¶ 67.

{¶22} Here, we cannot conclude the trial court's ultimate conclusion, in light of appellant's intellectual deficits and the reason for which he was initially committed, was unsound or unreasonable.

{¶23} Appellant's assignment of error lacks merit.

{¶24} For the reasons discussed in this opinion, the judgment of the Ashtabula County Court of Common Pleas is affirmed.


JOHN J. EKLUND, P.J.,

MATT LYNCH, J.,

concur.

9

Case No. 2022-A-0114