[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hickman*, Slip Opinion No. 2024-Ohio-5747.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5747

THE STATE OF OHIO, APPELLEE, *v.* HICKMAN, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hickman*, Slip Opinion No. 2024-Ohio-5747.]**

*R.C. 2945.401—Changes to commitment conditions following finding of not guilty by reason of insanity—Trial court's review of recommendation for change to nonsecured status or termination of commitment—A trial court must use its discretion to "approve, disapprove, or modify the recommendation," R.C. 2945.401(I), after considering all relevant factors, including those listed in R.C. 2945.401(E)(1) through (6)—Court of appeals' judgment affirmed.*

(No. 2023-0889—Submitted April 24, 2024—Decided December 10, 2024.)

APPEAL from the Court of Appeals for Ashtabula County, No. 2022-A-0114, 2023-Ohio-1793.

_____

BRUNNER, J., authored the opinion of the court, which KENNEDY, C.J., and DEWINE and DETERS, JJ., joined. DONNELLY, J., dissented, with an opinion joined by FISCHER, J. except for paragraphs 57-60 and by STEWART, J.

**BRUNNER, J.**

## I. INTRODUCTION

**{¶ 1}** Appellant, Delmar Hickman, has been continuously incarcerated or hospitalized since 1980, when he was arrested for the murder of his parents. In 1984, he pled not guilty by reason of insanity to two counts of aggravated murder and was committed to a mental-health facility. The managing officer of the facility to which he is currently committed recently recommended that he be granted conditional release to a nonsecured group home. The Ashtabula County Court of Common Pleas disapproved the recommendation.

**{¶ 2}** The court of appeals affirmed the trial court's judgment, and we accepted Hickman's appeal on the following proposition of law: "A trial court has no discretion to deny a change in commitment requested in the absence of clear and convincing evidence indicati[ng] that the level change should not be granted."

**{¶ 3}** For the reasons that follow, we affirm the judgment of the Eleventh District Court of Appeals affirming the trial court's judgment.

## II. FACTS AND PROCEDURAL HISTORY

**{¶ 4}** Many of the documents that were filed in the early stages of this case are not part of the record. However, the record contains a conditional-release plan that was submitted to the trial court by Heartland Behavioral Healthcare in 2021. Attached to that plan is a lengthy report titled "conditional-release evaluation" that was prepared by psychologist Dr. Zev Goldberg. The report recounts the history of the case as ascertained by Dr. Goldberg through his review of information from various sources, including Hickman and Hickman's medical records. We note that the parties do not contest the facts set out in the report, and in fact, they each attach

the report to their brief and rely on it in recounting the facts of the case. By necessity, we also rely on the report in our recitation of the facts of this case.

{¶ 5} Hickman was born in 1963 and lived on a farm at a marginal socioeconomic level. Hickman was a twin, and he and his twin were both in special-education classes at school. Around age 12, in 1975, Hickman was assessed with an IQ score of 56. Hickman's relatively low IQ may have been at least partially due to an ischemic brain injury he suffered at the age of three or four when his twin brother accidentally shot him.

{¶ 6} Hickman's parents were verbally and sometimes physically abusive. His father suffered from alcoholism, and after he had a leg amputated in 1979, he reportedly drank more heavily and became more abusive. Before the murders, Hickman did not have a history of legal trouble, but he admitted to a social worker in 1983 that in the time leading up to the murders, he had been stealing items (such as gum, cigarettes, and batteries) from stores and from the lockers at school, and he told a psychologist in 2012 that in the year before the murders he had hit his father in the head with a snow shovel when he was angry about shoveling snow. He also reported that in the year before the murders, he had begun experiencing seizures, but he said that the seizures stopped in 1980 when he was in the county jail. He ran away from home a number of times before the murders, sometimes returning on his own and sometimes being returned by the police.

{¶ 7} On August 14, 1980, when Hickman was 17 years old, Hickman's twin brother was on a ladder pounding a nail into a chicken coop and Hickman became concerned that his father was going to push his twin off the ladder. Hickman fetched a .22-caliber rifle and ammunition, told his brother to get off the ladder, and then began shooting at his parents. He missed them several times, but ultimately, after chasing both parents and shooting them repeatedly, he killed them both. In his own words, Hickman recounted the offense in a 2012 interview with a psychologist, Dr. Nathan Stephens, stating:

I wasn't thinking. I stayed overnight at my landlord's on August 13th . . . . On August 14th I knocked on the door, but they were down at the chicken house. I didn't say nothin'. I just snapped. I went into the house and got the .22 rifle and some shells and came back out and told my twin brother to get off the ladder. He went to the neighbors and called the police. I took a shot and missed my parents. My mom said, "He's got a gun." I ran back up to the house. She came to the kitchen, and I shot and missed her. I went back up to the chicken house and shot my dad but missed. My mom was yelling "Help," but the houses were far apart. I kept shooting her until she fell. I went to my dad and shot again but missed. He told me to put down the gun. I shot him in his good leg. That was the third shot. I loaded the gun again and shot him in the jaw. Loaded it again and shot him in his eye. I ran into the woods, the police came by. I came back and there was a policeman and he had a gun and he told me to put my hands up so I did. He arrested me by the road. Took me to the Ashtabula County Jail. I wasn't thinking. I don't know what set me off. I just needed someone to grab that gun when my dad told me to put it down. I wasn't thinking about nothing.

(Ellipsis added in Dr. Goldberg's report.)

{¶ 8} Following his arrest, Hickman was found incompetent to stand trial, and in September 1981, he was sent to what is currently known as Twin Valley Behavioral Healthcare. In June 1982, having shown no evidence of psychiatric problems or need for maximum-security hospitalization, he was sent to Massillon State Hospital, which is now known as Heartland Behavioral Healthcare

("Heartland"). Hickman's attending psychiatrist at Massillon diagnosed him as having borderline intellectual functioning, intermittent explosive disorder, schizoid-personality disorder, and a seizure disorder.

**{¶ 9}** Hickman was returned to jail in March 1983 for adjudication of his case and was found not guilty by reason of insanity in August 1984, *see* R.C. 2901.01(A)(14) and 2945.40. Following his adjudication, Hickman spent the remainder of 1984 and some of 1985 in the Dayton Mental Health Center ("Dayton MHC"). In September 1985, Hickman was transferred back to Heartland based on a Dayton MHC doctor's observation that he socialized well, complied with all ward rules, was housed in the least restrictive unit in Dayton MHC, and was in the honor section of his ward. Though the same doctor noted that Hickman has impulse-control problems when he is angry, he also noted that Hickman had sincerely sought to learn new modes of behavior when provoked and that he had never been hostile toward any staff members.

**{¶ 10}** While Hickman was at Heartland in 1985, he underwent a new psychiatric evaluation and was diagnosed with borderline intellectual functioning and antisocial-personality disorder, but the psychiatrist noted that Hickman had learned to control his explosive behavior.[1] In 1987, Hickman was permitted to begin working outside the facility at Goodwill, where he worked on the loading dock until 2012, when the business changed management and his employment was terminated. His employment record indicates that he was a good employee and that he was well-liked by his coworkers.

**{¶ 11}** In 2004, Hickman was granted Level V nonsecured-movement privileges, which means that he is permitted to leave Heartland unsupervised for periods of time each day. Since that time (other than during intervals of COVID

---

1. We note that Dr. Goldberg indicates in his report that he disagrees with this early diagnosis, which was made 36 years before Goldberg evaluated Hickman.

lockdown), Hickman has spent up to six hours a day, sometimes multiple days a week, outside the facility unsupervised without incident.

{¶ 12} The two most recent evaluations of Hickman (the one by Dr. Goldberg mentioned above dated November 2021 and one prepared by another psychologist, Dr. Jessica Hart, dated February 2022) diagnosed him with borderline intellectual functioning and unspecified trauma- and stressor-related disorder. These evaluations were performed when Hickman's treatment team at Heartland (which includes Dr. Goldberg) sought his conditional release to a nonsecured facility, Richwood Residential Center ("Richwood"). Dr. Goldberg and Dr. Hart (whose evaluation was performed when the trial court ordered the Forensic Psychiatric Center of Northeast Ohio, Inc., to provide a second opinion related to the recommendation) both recommended in favor of the release to Richwood.

{¶ 13} The trial court held a hearing on the matter, and Dr. Goldberg, who has worked at Heartland since 2018 and interacts with Hickman approximately five days a week, testified consistently with his report. He opined that Hickman should be granted conditional release to the nonsecured facility, Richwood. Dr. Goldberg testified that intermittent explosive disorder is not one of Hickman's present conditions and that he has not been diagnosed with that disorder since the mid-1980s. The doctor acknowledged that Richwood is not a lockdown facility and that Hickman would be free to come and go as he pleased, which contrasts with his current living conditions at Heartland, which can be locked down. Heartland also requires Hickman to return at a certain time each day. Dr. Goldberg noted that Hickman has been permitted to leave Heartland unsupervised since 1987 and that there have not been any issues reported with his presence in the community. Dr. Goldberg also testified that Hickman has not been on any medication for the majority of his time at Heartland and that no medication is medically necessary. The doctor did acknowledge, however, that Hickman has been taking aripiprazole

daily since 2017 as a precaution to control any impulsivity as he has reintegrated into the community.

{¶ 14} During the hearing, the court in addition heard testimony from David Lovejoy, a 41-year employee with the Ashtabula County Board of Developmental Disabilities. Lovejoy described Richwood as an eight-bed facility with 24/7 staffing, including a duty nurse. Lovejoy stated that if Hickman were to reside at Richwood, then any unusual incidents that might occur would be documented and reported to Hickman's guardian and whoever else is associated with his case.

{¶ 15} The court also accepted nontestimonial oral statements from the executive director of the Forensic Psychiatric Center, Hickman's appointed guardian, and Hickman's case manager from Signature Health. The executive director of the Forensic Psychiatric Center stated that Heartland's conditional-release plan "strikes an excellent balance between allowing [Hickman] to have the privilege of living in the community [and] protecting public safety" and that the plan offers "multiple areas of protection." Hickman's guardian stated that he would closely monitor Hickman. Finally, the case manager from Signature Health indicated that he would be spending a significant amount of time with Hickman to help him get settled if he were released from Heartland to Richwood.

{¶ 16} Appellee, the State of Ohio, did not call an independent mental-health expert to testify at the hearing but instead called Dr. Goldberg as a witness. The prosecutor and the trial-court judge questioned Dr. Goldberg on Hickman's mental health and on the differences between the commitment conditions at Heartland and Richwood.

{¶ 17} The trial court disapproved the recommendation for Hickman's conditional release. It noted that under R.C. 2945.401, it has more discretion in cases that involve a recommendation for nonsecured status than it does in cases that involve a recommendation for off-grounds supervised movement. It then made the following finding:

The court has discretion to disapprove or modify an institution's recommendation for a committed person's nonsecured movement or termination of the person's commitment. R.C. 2945.401(I) states the court "may approve, disapprove, or modify" a recommendation made under R.C. 2945.401(D)(1) giving the court more discretion to disapprove or modify a recommendation for nonsecured status or termination of commitment.

It then made the following finding:

Mr. Hickman would benefit from continued treatment in a hospital setting to address his Borderline Intellectual Functioning, Intermittent Explosive Disorder, and Schizoid Personality Disorder as described in the reports. The Court further finds that Mr. Hickman is a potential threat to public safety and other people if he were to be released in an uncontrolled and unmonitored environment other than a hospital setting. The least restrictive commitment alternative available consistent with the welfare of [Mr. Hickman] and public safety remains commitment to Heartland Behavioral Healthcare at his current Level 5 movement.

The trial court noted that it was aware of Hickman's "history of violence, and the continued need to monitor his behavior closely," and it stated: "[T]he Court concludes that the State of Ohio has shown by clear and convincing evidence that there is a danger and risk to public safety if the Conditional Release is allowed at this time."

**{¶ 18}** On appeal, the Eleventh District affirmed. 2023-Ohio-1793 (11th Dist.). It stated that the trial court erred in finding that Hickman needed to continue treatment for intermittent explosive disorder and schizoid-personality disorder, given that evidence was presented that Hickman is not presently diagnosed with those conditions. *Id.* at ¶ 19. Nevertheless, it reasoned:

> Still the trial court's focus upon [Hickman's] borderline intellectual functioning and the severity of his history of violence are uncontroverted. And even though there was testimony and evidence that [Hickman] would be, at some basic level, monitored in the group home, that monitoring would be less rigorous than that of a hospital setting. In this respect, and in light of [Hickman's] history, we cannot conclude the trial court was unreasonable in concluding [that Hickman] "is a potential threat to public safety and other people if he were to be released in an uncontrolled and unmonitored environment other than a hospital setting."

*Id.* at ¶ 20. In its final analysis, the court of appeals stated that it could not conclude that the trial court's ultimate conclusion was unsound or unreasonable, "in light of [Hickman's] intellectual deficits and the reason for which he was initially committed." *Id.* at ¶ 22.

**{¶ 19}** Hickman appealed to this court asserting that a trial court has no discretion when clear and convincing evidence is not offered, positing a single proposition of law: "A trial court has no discretion to deny a change in commitment requested in the absence of clear and convincing evidence indicati[ng] that the level change should not be granted."

## III. ANALYSIS

## A. Did the Trial Court Have Discretion?

{¶ 20} The question Hickman raised before the Eleventh District was whether the trial court *abused its discretion* in disapproving Heartland's recommendation of his conditional release. Here, Hickman initially sidesteps whether the trial court abused its discretion, arguing that the State did not meet its burden of proof in opposing the recommended change and therefore, under R.C. 2945.401, the trial court *lacked discretion* to disapprove it. The State opposes Hickman's argument based on the plain language of R.C. 2945.401(I), which authorizes a trial court to use its discretion to approve, modify, or disapprove the recommendation of the confinement facility and does not refer to the State's evidentiary burden. Because this is a question of statutory interpretation, appellate review is de novo. *State v. Fork*, 2024-Ohio-1016, ¶ 13.

{¶ 21} R.C. 2945.401 provides a comprehensive scheme that accords continuing trial-court jurisdiction over the commitment conditions of people, such as Hickman, who have been adjudicated not guilty by reason of insanity and who have been committed to a mental-health facility by court order. The people and entities that participate in determining the appropriate care and setting for people such as Hickman include the trial court with jurisdiction over the person, the facility to which the person is committed, and the prosecutor. The facility is required to make periodic reports to the trial court, providing, through a representative of the facility, an evaluation of whether the person "remains a person with a mental illness subject to court order." R.C. 2945.401(C). In addition, the facility may recommend a termination of the person's commitment or a change in the conditions of the person's commitment. R.C. 2945.401(D).

{¶ 22} R.C. 2945.401 provides two avenues of review of recommendations for a change in commitment conditions, depending on the nature of the recommended change. If "on-grounds unsupervised movement or off-grounds

supervised movement" is recommended, then R.C. 2945.401(D)(1)(a) applies. In *State v. Stutler*, 2022-Ohio-2792, ¶ 15, we concluded that in such cases, "unless the prosecution proves by clear and convincing evidence that the institution's recommended change in the person's commitment conditions would result in a threat to public safety or any person, the trial court does not have discretion to deny the recommended change."

{¶ 23} If, on the other hand, the recommendation is that the person's commitment be terminated or that the person be moved to nonsecured status (the latter being the recommendation in Hickman's case—that he be moved to a nonsecured group home), then R.C. 2945.401(D)(1)(b) through (d) apply. These divisions of R.C. 2945.401 provide for a more robust review than division (D)(1)(a) does. They include an evaluation by the local forensic center, formulation of a plan to implement the recommendation,[2] consultation with community mental-health boards, an independent expert evaluation procured by the prosecutor, if he or she believes that is necessary, and a hearing. R.C. 2945.401(D)(1)(b) through (d). These procedures are much more complex than the relatively straightforward procedure regarding recommendations for "on-grounds unsupervised movement or off-grounds supervised movement," R.C. 2945.401(D)(1)(a).

{¶ 24} Moreover, under R.C. 2945.401(E), when trial courts evaluate recommendations for nonsecured status or termination of commitment they must consider "all relevant factors, including, but not limited to, all of the following" six factors:

---

2. The State argues in this court that Heartland's plan for the implementation of its recommendation that it filed in the trial court failed to meet the requirements of R.C. 2945.401(D)(1)(b)(iii), but it forfeited this argument by failing to raise it in the court of appeals.

(1) Whether, in the trial court's view, the defendant or person currently represents a substantial risk of physical harm to the defendant or person or others;

(2) Psychiatric and medical testimony as to the current mental and physical condition of the defendant or person;

(3) Whether the defendant or person has insight into the defendant's or person's condition so that the defendant or person will continue treatment as prescribed or seek professional assistance as needed;

(4) The grounds upon which the state relies for the proposed commitment;

(5) Any past history that is relevant to establish the defendant's or person's degree of conformity to the laws, rules, regulations, and values of society;

(6) If there is evidence that the defendant's or person's mental illness is in a state of remission, the medically suggested cause and degree of the remission and the probability that the defendant or person will continue treatment to maintain the remissive state of the defendant's or person's illness should the defendant's or person's commitment conditions be altered.

**{¶ 25}** R.C. 2945.401(G)(2) sets out the burden of proof for the State regarding any opposition it has to a change to nonsecured status and provides that the State must "show by clear and convincing evidence that the proposed change represents a threat to public safety or a threat to the safety of any person."

**{¶ 26}** Finally, R.C. 2945.401(I) instructs the trial court that it "may approve, disapprove, or modify the recommendation and shall enter an order accordingly."

{¶ 27} Thus, R.C. 2945.401 sets out the role of the trial court in considering a recommendation that a committed person move to nonsecured status, and it does not make the court's ultimate determination dependent on whether the prosecutor carried his or her burden under division (G)(2). *Compare* R.C. 2945.401(G)(2) *with* R.C. 2945.401(E). As noted above, R.C. 2945.401(E) sets forth six nonexclusive factors for a trial court to consider when reviewing a recommendation that a person who was committed to a secure mental-health facility after being found not guilty by reason of insanity be moved to a nonsecure facility. One of these factors—"[w]hether, in the trial court's view, the defendant or person currently represents a substantial risk of physical harm to the defendant or person or others," R.C. 2945.401(E)(1)—is directly related to the prosecutor's burden under division (G)(2). Other factors in division (E) instruct and empower the trial court to consider matters unrelated to the prosecutor's burden, such as whether the person has the insight into his or her condition such that he or she will continue the prescribed treatment or seek assistance as needed, R.C. 2945.401(E)(3). Then R.C. 2945.401(I) vests discretion in the trial court, stating that it "may approve, disapprove, or modify the recommendation and shall enter an order accordingly."

{¶ 28} The divisions of R.C. 2945.401 dealing with a recommendation for nonsecured status require considerations by the court and other entities that go beyond the safety consideration that the prosecutor has the burden of producing clear and convincing evidence to support under division (G)(2). Under the plain language of the statute, the evidence presented by the prosecutor in carrying his or her burden is a matter to be considered, but the trial court is not required to approve a recommendation simply because the prosecutor does not prove by clear and convincing evidence that the change to nonsecured status will result in "a threat to public safety or a threat to the safety of any person," R.C. 2945.401(G)(2). Accordingly, a trial court must use its discretion to "approve, disapprove, or modify

the recommendation," R.C. 2945.401(I), after considering all relevant factors, including those listed in R.C. 2945.401(E)(1) through (6).

{¶ 29} *Stutler*, 2022-Ohio-2792, which both Hickman and the State cite, does not dictate the outcome of this case, because *Stutler* involved a recommendation for "off-grounds supervised movement," *id*. at ¶ 14, an entirely different situation from Hickman's and one that would require a different review under R.C. 2945.401 than the review required for the recommendation made in Hickman's case. We distinguish *Stutler* from this case on its facts and the law. Specifically, in *Stutler*, the institution recommended that Stutler be permitted supervised community outings from the facility to which he had been committed. *Id.* at ¶ 4. The trial court disapproved the recommended status change. *Id.* In reversing the court of appeals, which had affirmed the trial court, we held that in a case involving a status change to allow off-grounds supervised movement, a trial court has no discretion to disapprove the recommended change unless the prosecutor meets its burden of proof in opposing the change. *Id.* at ¶ 15.

{¶ 30} Although it is not controlling here, *Stutler* is informative for its discussion of the differences between the language of the division of R.C. 2945.401 that controls the review of recommendations for on-grounds movement or off-grounds supervised movement and the language of the divisions of the statute that control the review of recommendations for nonsecured status or termination of commitment. Critically, we note that when a change to nonsecured status is contemplated, R.C. 2945.401(E) controls, but R.C. 2945.401(E) is not implicated when the change recommended and requested is to a supervised status, such as occurred in *Stutler*. *Stutler* at ¶ 14-15. In *Stutler*, we stated that the six factors of R.C. 2945.401(E) "apply only when there has been a request under R.C. 2945.401(D)(1) for '*nonsecured status or termination of commitment*.' " (Emphasis added in *Stutler*.) *Stutler* at ¶ 14, quoting R.C. 2945.401(E). We also further noted:

That a trial court has more discretion to disapprove or modify an institution's recommendation for a committed person's nonsecured movement or termination of the person's commitment explains why the legislature chose to use the word "may" in R.C. 2945.401(I). R.C. 2945.401(I)'s statement that the trial court "may approve, disapprove, or modify" a recommendation made under R.C. 2945.401(D)(1) shows that the court has more discretion to disapprove or modify a recommendation for nonsecured status or termination of commitment based on its findings under R.C. 2945.401(E) than it does for other recommendations for changes that involve the person's remaining supervised.

*Id.* at ¶ 15. Thus, *Stutler* clarified that there is a difference in the discretion afforded to the trial court by R.C. 2945.401 based on the kind of change requested.

{¶ 31} At the heart of Hickman's proposition of law is his contention that a trial court has no discretion to disapprove a recommended change in commitment conditions if the State fails to carry its burden under R.C. 2945.401(G)(2). If the recommended change were to a supervised status, as was the case in *Stutler*, Hickman would be correct. However, the recommendation in this case is that Hickman's status be changed to nonsecured, and under R.C. 2945.401(E) and *Stutler* at ¶ 14, when nonsecured status is recommended, the additional factors in R.C. 2945.401(E) are applicable, meaning that the trial court has discretion to disapprove a recommendation even if the State does not meet its burden of proof. *See* R.C. 2945.401(I); *Stutler* at ¶ 15. Whether the State carries its burden to show that "the proposed change represents a threat to public safety or a threat to the safety of any person," R.C. 2945.401(G)(2), may be considered by the trial court, but it retains discretion to approve, modify, or disapprove the facility's recommendation

after considering all the relevant factors, including those listed in R.C. 2945.401(E). *See* R.C. 2945.401(I). Therefore, the Eleventh District's judgment must be affirmed, because this was a matter within the trial court's discretion.

### B. Did the Trial Court Abuse Its Discretion?

{¶ 32} Although Hickman argues a single proposition of law on appeal to this court—that the trial court had *no* discretion—his assignment of error to the court of appeals was that the trial court *abused* its discretion. It is worthwhile for this court to address the issue whether the trial court abused its discretion for the purposes of clarifying the law of the case as it applies here and as it may be argued and applied in future similar cases. The trial court did not abuse its discretion accorded to it by R.C. 2945.401.

> "We have defined an abuse of discretion as conduct that is unreasonable, arbitrary or unconscionable." [*State v.* ]*Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, 97 N.E.3d 474, at ¶ 12, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A decision is arbitrary if it is made "'without consideration of or regard for facts [or] circumstances.' " (Brackets added in *Beasley*.) *Id.*, quoting *Black's Law Dictionary* 125 (10th Ed.2014). A decision may also be arbitrary if it is "'"[w]ithout [an] adequate determining principle; . . . not governed by any fixed rules or standard."' " (Brackets added; ellipsis added in *McGee*.) *Id.*, quoting *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359, 423 N.E.2d 1095 (1981), quoting *Black's Law Dictionary* 96 (5th Ed.1979).

*State v. Hill*, 2022-Ohio-4544, ¶ 9. "An abuse of discretion includes a situation in which a trial court did not engage in a '"sound reasoning process."' " *State v.*

*Darmond*, 2013-Ohio-966, ¶ 34, quoting *State v. Morris*, 2012-Ohio-2407, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

**{¶ 33}** Here, the trial court concluded that Hickman "would benefit from continued treatment in a hospital setting to address his Borderline Intellectual Functioning, Intermittent Explosive Disorder, and Schizoid Personality Disorder." Although, as the Eleventh District pointed out, the record indicates that Hickman no longer suffers from intermittent explosive disorder or schizoid personality disorder, 2023-Ohio-1793, ¶ 19 (11th Dist.), the trial court also found that "Hickman is a potential threat to public safety and other people if he were to be released in an uncontrolled and unmonitored environment other than a hospital setting." While we acknowledge that the evidence presented at the hearing was generally favorable on the subject of Hickman's status change, it remains the case that with little to no known provocation, Hickman chased and repeatedly shot his parents until they were dead. It is also true that Hickman has been venturing into the community unsupervised several days a week since 1987 without incident. However, even by Hickman's own telling, the murders resulted from a compulsion that arose without clear explanation or apparent trigger. When asked to explain why he had shot his parents, he said, "I wasn't thinking. I don't know what set me off." Thus, despite the fact that he has done well in an institutional setting, no real assurance has been offered that Hickman will not again be "set off" if he is allowed to live full-time in nonsecured status. For that reason, the trial court was within its discretion when it concluded, after considering all the relevant factors, that Hickman "is a potential threat to public safety and other people if he were to be released in an uncontrolled and unmonitored environment other than a hospital setting."

**{¶ 34}** In short, given the profoundly troubling circumstances of the offense and Hickman's inability to identify a trigger that set off his rampage, we must

affirm the Eleventh District Court of Appeals' judgment affirming the trial court's disapproval of Heartland's recommendation. Because of Hickman's borderline intellectual functioning and his history of severe violence and the fact that monitoring in a group home would be less rigorous than it is in his current setting, we cannot conclude the trial court's conclusion was unsound or unreasonable. *See* 2023-Ohio-1793 at ¶ 20, 22.

## IV. CONCLUSION

**{¶ 35}** When an institution to which a person has been committed under R.C. 2945.40 recommends under R.C. 2945.401(D)(1) that the person's commitment status be changed to nonsecured, the State bears the burden of proof to show that "the proposed change represents a threat to public safety or a threat to the safety of any person," in opposing the recommended change, R.C. 2945.401(G)(2). Whether the State carried its burden is a factor to be considered by the trial court when considering whether to approve, modify, or disapprove the recommendation. *See* R.C. 2945.401(E)(1) and (4). But R.C. 2945.401(E) also requires the trial court to consider (2) any psychiatric and medical testimony regarding the committed person's mental and physical health, (3) the committed person's insight into his or her mental-health condition, (5) the committed person's history relevant to his or her degree of conformity with the laws, regulations, and values of society, and (6) any evidence regarding remission of the committed person's mental illness and the likelihood that he or she will continue treatment to maintain the remissive state if his or her commitment conditions are altered. Thus, R.C. 2945.401(E) instructs and empowers the trial court to consider factors additional to and independent of the safety-focused factor the prosecutor has the burden of proving. R.C. 2945.401(I) vests unqualified discretion in the trial court, stating that it "may approve, disapprove, or modify the recommendation and shall enter an order accordingly." While a trial court must consider whether a recommended change represents a safety threat, irrespective of its finding in that

regard, it has discretion to approve, disapprove, or modify a recommendation for nonsecured status.  R.C. 2945.401(E) and (I).

**{¶ 36}** Here, we agree with the Eleventh District that the trial court acted within its discretion.  Although, as the Eleventh District stated, some of the trial court's findings were not supported by the evidence, 2023-Ohio-1793, at ¶ 19 (11th Dist.), the trial court nevertheless acted within its discretion when it found that Hickman "is a potential threat to public safety and other people if he were to be released in an uncontrolled and unmonitored environment other than a hospital setting."  While it is true, as Hickman points out, that much of the evidence at the hearing supported the assertion that he has done well living in a secured facility with privileges to go into the community without supervision, the fact remains that in 1980, for no reason that Hickman or anyone else has ever satisfactorily identified, Hickman was abruptly "set off," with the result that he chased down and shot his parents, repeatedly stopping to reload so that he could fire—again and again—until they were dead.  Despite Hickman's history of success while living in an institutional setting, the trial court did not abuse its discretion in finding no real assurance that Hickman will not again be "set off" if allowed to live full-time in nonsecured status.  For that reason, the trial court was within its discretion to disapprove the recommendation that Hickman's status be changed to nonsecured and the Eleventh District did not err in upholding that exercise of discretion.

**{¶ 37}** We therefore affirm the judgment of the Eleventh District Court of Appeals.

Judgment affirmed.

_____

**DONNELLY, J., joined by FISCHER, J., except for paragraphs 57-60 and by STEWART, J., dissenting.**

**{¶ 38}** For nearly 40 years, Delmar Hickman has been committed to a mental-health facility, following the trial court's finding him not guilty by reason

of insanity for the murder of his parents. As required by statute, Hickman's commitment is subject to periodic review by the trial court. R.C. 2945.401. In 2021, those responsible for Hickman's care recommended that he be moved to a nonsecured group home. The State of Ohio, however, opposed the recommendation on the grounds that Hickman posed a danger to public safety. Despite the State's failing to present any evidence in support of its objection, the trial court disapproved the recommended change in Hickman's commitment status. Today, a majority of this court concludes that the trial court acted within its discretion, despite statutory language requiring the State to support its objection to the change in Hickman's status with clear and convincing evidence. Because I believe that the majority misreads the statute and that the resulting caselaw will deny people who are committed to the State's care meaningful review of recommendations for change in the conditions of their commitment, I dissent.

**Background**

{¶ 39} In 1980, at age 17, Hickman killed his parents. The majority opinion recounts the harrowing facts of the killings at length, majority opinion, ¶ 7, 33, and there is no reason to repeat them here. Four years after the offenses, the trial court found Hickman not guilty by reason of insanity. Hickman was committed to the care of the State, and for the past 39 years, he has been hospitalized at Heartland Behavioral Healthcare ("Heartland").

{¶ 40} In 2021, hospital staff at Heartland recommended that Hickman receive conditional release to a nonsecured facility. In an evaluation report recommending the change, Dr. Zev Goldberg—a psychologist on Hickman's treatment team—pointed to Hickman's long-term psychiatric stability, adherence to treatment, compliance with hospital rules, and lack of "significant violent behavior" since his admission in 1985, as evidence that a nonsecured facility would be the appropriate and least restrictive setting for Hickman to continue his treatment. Dr. Goldberg also explained how the services and supervision Hickman

would receive in the nonsecured facility also supported the recommended change. Because Dr. Goldberg's report recommended a conditional release, the trial court obtained a second evaluation from the local forensic center as required by R.C. 2945.401(D)(1)(b). That evaluation, conducted by psychologist Dr. Jessica Hart, also recommended that the court approve Hickman's conditional release to a nonsecured treatment facility. In support of her recommendation, Dr. Hart noted that Hickman had successfully enjoyed a reduced level of supervision at Heartland since 2004; had complied with medication and treatment requirements; did not exhibit suicidal or homicidal thoughts or severe mood, anxiety, or psychotic symptoms; and recognized that he needs to continue with ongoing treatment and medication requirements.

{¶ 41} The State of Ohio opposed the proposed change to Hickman's status, arguing that he continued to pose a threat to public safety. But rather than rebutting the reports provided by Dr. Goldberg or Dr. Hart or presenting evidence of the ostensible threat that Hickman presented, the attorney arguing for the State merely rehashed the facts of Hickman's misdeeds and provided her personal opinions as to the value of court-ordered evaluations.

{¶ 42} The trial court held a hearing on the recommendation in October 2022, and the State called Dr. Goldberg as a witness. In his testimony, Dr. Goldberg acknowledged that Hickman's current diagnoses were mild intellectual disability and borderline intellectual functioning and unspecified trauma and stressor related disorder. But he also pointed out that the initial diagnosis of intermittent explosive disorder was no longer current and had been rejected by Hickman's treatment team. Dr. Goldberg added that Hickman had successfully been employed at a Goodwill store in Massillon, Ohio, for 25 years and had had only one behavioral incident at the store. He noted that Hickman had reported the incident to hospital staff and that the incident had not resulted in significant disciplinary action by the employer. Dr. Goldberg also spoke of Hickman's "excellent" reputation at Heartland, his

compliance and cooperation with his treatment, and his successful unsupervised journeys outside the hospital for work and social activities. Lastly, Dr. Goldberg repeated his strong recommendation that Hickman be transferred to a nonsecured facility.

{¶ 43} As summarized by the majority opinion, the trial court also heard testimony from a representative of the facility to which Hickman would be transferred and received nontestimonial statements from the director of the Forensic Psychiatric Center, Hickman's guardian, and his case manager. Majority opinion at ¶ 14-15. None of these people expressed an opinion or offered evidence that Hickman continued to pose a threat to himself or others. Nor did any of these people suggest that Hickman should not be released to a nonsecured facility.

{¶ 44} Even so, the trial court disapproved the recommendation for Hickman's conditional release. Characterizing its decision as an exercise of its discretion under R.C. 2945.401(I), the trial court found that Hickman remained a threat to public safety and expressly stated that this finding was rooted in the clear and convincing evidence presented by the State of Ohio.

{¶ 45} The Eleventh District Court of Appeals affirmed the trial court's judgment, 2023-Ohio-1793 (11th Dist.), and we accepted Hickman's discretionary appeal to this court, 2023-Ohio-3697.

### Discussion

{¶ 46} In his proposition of law to this court, Hickman asserts that a trial court cannot disapprove a recommended change in commitment level for a person committed to a mental-health facility when the State fails to present clear and convincing evidence that the change should be disapproved. The majority disagrees with this proposition and concludes that the statute governing the change in the status of a committed person to nonsecured status—the change recommended for Hickman—gives the trial court discretion to "approve, modify, or disapprove" the recommendation, provided the trial court considers all relevant factors,

irrespective of any evidentiary burden placed on the State. Majority opinion, ¶ 31. I disagree with the majority opinion in three respects. First, the majority misreads the statutory language governing the review of recommendations for a change in commitment status. Second, the majority ignores that there is no evidence to support the trial court's decision here. And third, the precedent that the majority sets has disturbing consequences beyond the unjust result in this case.

*The majority decision relieves the State of its evidentiary burden*

{¶ 47} As discussed above, Hickman was found not guilty by reason of insanity and committed to a mental-health facility, making Hickman and the conditions of his commitment subject to the continuing jurisdiction of the trial court, *see generally* R.C. 2945.401. Under R.C. 2945.401(D), the managing officer of a mental-health facility may recommend changes to the conditions of a person's commitment. When, as here, the managing officer recommends that a person be transferred to "nonsecured" status, a trial court evaluates the recommendation using the process set out in R.C. 2945.401(D)(1)(b) through (d), including holding a hearing on the matter. If the State objects to the recommendation of nonsecured status, as it did with Hickman, then it must "show by clear and convincing evidence that the proposed change represents a threat to public safety or a threat to the safety of any person," R.C. 2945.401(G)(2). I believe that R.C. 2945.401(G)(2) places a burden on the State that the majority attempts to explain away.

{¶ 48} This court's approach to statutory interpretation is a matter of rote at this point. Our goal in statutory interpretation is to determine the General Assembly's intent in enacting the statute, and we achieve that goal by looking first to the language used in the statute. When the statute's meaning is clear and definite, it must be applied as written. *State v. Anthony*, 2002-Ohio-4008, ¶ 10. R.C. 2945.401(G)(2) is a rare example of a statute with a clear and definite meaning. The obligation placed on the State in R.C. 2945.401(G)(2) is clear: in a hearing to determine whether a person's commitment status may be reduced to a

less restrictive status, the State must show through clear and convincing evidence that the proposed change in status poses a threat to public safety or the safety of any person. There is no ambiguity to this provision. It does not provide any exceptions to the burden; nor does it make this burden subject to any of the other provisions of the statute. And it is this evidentiary burden that Hickman asserts the State failed to meet.

{¶ 49} Despite the clear obligation that R.C. 2945.401(G)(2) places on the State, the majority explains it away by saying that the burden of proof is trumped by other subsections of the statute. In particular, the majority points to the discretion afforded to the trial court to "approve, disapprove, or modify the recommendation" in R.C. 2945.401(I) and the fact that public safety is only one of several factors in a nonexhaustive list that the trial court must consider when evaluating the recommendation under R.C. 2945.401(E)(1) through (6). Majority opinion at ¶ 28.

{¶ 50} The majority's reading of the statute makes R.C. 2945.401(G)(2) a dead letter. The question whether a person recommended for a change in the conditions of his commitment poses a threat to himself or others is the *only* factor the trial court must consider that carries an evidentiary burden. *Compare* R.C. 2945.401(E)(1) through (6) *with* R.C. 2945.401(G)(2). Rather than hold the State to its obligation under the statute, trial courts may now (under the majority's interpretation of the statute) excuse the State's failure to meet its evidentiary obligation by simply stating that the trial court considered the threat-to-self-or-others factor (irrespective of whether the State provided any evidence, let alone clear and convincing evidence) and is exercising its discretion in disapproving the recommendation. Indeed, if, as the majority opinion suggests, the trial court's decision is unfettered from the State's obligation to show that the proposed change is a threat to public safety, *see* majority opinion, ¶ 31, then there is little need for

the State to put on any evidence at all, because that evidence will not affect the trial court's decision.

*The majority decision ignores what happened in this case*

{¶ 51} One need only look at the trial court's actions here to see the dangers of the majority opinion. In its order disapproving the recommended change in the conditions of Hickman's commitment, the trial court stated that it found that Hickman continued to be a threat to public safety and that it based that finding on the reasons stated in the State's brief and the "information before the Court." But the information before the court said the exact opposite.

{¶ 52} As discussed above, after evaluating Hickman, Dr. Goldberg and Dr. Hart both concluded in their reports that he was not a threat to himself or to others. The evaluation reports and Dr. Goldberg's testimony note that Hickman had successfully held down a job for a quarter of a century and that Hickman had been allowed to travel into the community *unsupervised* to engage in his employment and in social activities. Similarly, the evidence showed that Hickman complied with and cooperated in meeting his treatment requirements and was considered an "excellent" patient. And Dr. Goldberg was called *as the State's witness*. Thus, the State's evidence didn't merely fail to show that Hickman was a threat to himself or to others; it showed the exact opposite.

{¶ 53} Yet even without evidence, the trial court found Hickman to be a threat to public safety and disapproved the recommendation on that basis alone. In short, the trial court's decision hinged on the factor for which the statute sets a burden of proof. And the State provided no evidence to meet that burden. Indeed, it bears repeating—the evidence the State did present uniformly points to Hickman's no longer posing a threat to himself or others.

{¶ 54} But even setting aside the issue of the State's evidentiary burden under R.C. 2945.401(G)(2), the trial court's order here doesn't meet R.C. 2945.401's requirements. Under R.C. 2945.401(E), there are six factors a trial

court *must* consider when evaluating a recommendation that a committed person be placed on nonsecured status. Yet the trial court states that its decision is based on only one of the mandatory factors—public safety—and then asserts that its determination rests on the State's evidence. But once again, the State simply did not produce evidence that Hickman would pose a threat to public safety if the recommendation were approved.

{¶ 55} The majority concludes that the trial court's decision was a permissible exercise of its discretion under R.C. 2945.401(I). But in so concluding, the majority simply reverse engineers its desired result and fails to apply its own interpretation of the statute. A trial court abuses its discretion when it makes its decision in an arbitrary, unreasonable, or unconscionable manner. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 34, citing *Celmer v. Rodgers*, 2007-Ohio-3697, ¶ 19 (plurality opinion), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). And no court—not even this one—has discretion to misapply the law. *Id.* at ¶ 38.

{¶ 56} In its decision disapproving the recommended change to Hickman's commitment status, the trial court failed to specifically address five of the six factors it must consider when making its determination. And the one factor it did specifically consider and which it found dispositive was not supported by clear and convincing evidence, as required by the statute. What's more, even if you accept the majority's conclusion that the State's failure to meet its burden does not hinder the trial court's discretion, the trial court's order provides no explanation for its decision beyond its conclusion that the evidence shows that Hickman remains a threat to public safety. In other situations, this brute assertion might be adequate. But here, where the evidence solidly supports the opposite conclusion, the lack of any explanation is telling. It is hard to see how the trial court's decision is anything but arbitrary. That the decision is arbitrary should alone be enough for this court to reverse the court of appeals' judgment upholding the trial court's decision. And that leads me to my final concern with the majority opinion.

*The majority decision will undermine meaningful review of future recommendations for changes in commitment status*

{¶ 57} The work of a trial-court judge is not easy, nor is it for the faint of heart. I know. I worked as a trial-court judge for 14 years. Trial-court judges are asked to make decisions that have profound effects on the individual litigants before the court, as well as on the communities in which the court is situated. And few decisions are likely more difficult than determining the commitment status of mentally ill people who have, like Hickman, committed violent and disturbing acts. These decisions often involve facts that evoke emotional responses from the public, and the trial court must undertake the unenviable task of determining the least restrictive commitment alternative that is consistent with public safety and treatment goals, *see* R.C. 2945.40(F). And it is because of the emotionally charged nature of these proceedings that trial courts must ensure that their decisions are based only on the law and the evidence before them.

{¶ 58} Today the majority gives trial-court judges carte blanche to ignore the evidence and go with their gut when deciding whether to approve a recommendation that a committed person be subject to less restrictive conditions of commitment. Does the State fail to present clear and convincing evidence that the person is a threat to public safety? Don't worry, trial-court judge, that's an obligation of the State, and it does not affect your discretion. Does the evidence show that several of the factors you must consider when evaluating the recommendation almost exclusively weigh in favor of approving the recommendation? Don't sweat it; just ignore those factors and point to the scariest one—public safety—as being dispositive. It doesn't matter if there's no evidence for it; if someone appeals, we'll find something that supports your conclusions and slough it off as you exercising your discretion. What really matters is how you feel about the underlying acts that led to the commitment.

**{¶ 59}** And that's what the majority does today. It states that the trial court should consider multiple factors, but then focuses on only one—public safety. And rather than look to the evidence on that factor, the majority simply recounts the unsettling facts of Hickman's actions several times. The decades of treatment, the change in diagnoses from those made at his initial commitment, Hickman's cooperation in and compliance with his treatment, his quarter century of employment, his successful unsupervised engagements with the community, and the recommendations of multiple professionals that nonsecured status is the appropriate least restrictive commitment alternative for Hickman are all for naught. Because a traumatized, mentally ill man cannot explain an act of violence he committed more than 40 years ago to the majority's satisfaction, the majority affirms the court of appeals' judgment upholding the trial court's decision to disapprove the recommendation.

**{¶ 60}** The majority's decision is unmoored from the law and from the realities of this case. What's more, it sets a dangerous precedent. I dissent.

_____

Colleen Mary O'Toole, Ashtabula County Prosecuting Attorney, and Mark Majer and Matthew J. Hebebrand, Assistant Prosecuting Attorneys, for appellee.

Margaret Brunarski, Ashtabula County Public Defender, and Michael J. Ledenko, Assistant Public Defender, for appellant.

Elizabeth R. Miller, Ohio Public Defender, and Jeremy Masters and Russell Patterson, Assistant Public Defenders, urging reversal for amicus curiae, Ohio Public Defender.

_____